ALEX G. TSE (CABN 152348)
Acting United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

TIMOTHY J. LUCEY (CABN 172332)
Assistant United States Attorney

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    FAX: (408) 535-5066
    Timothy.lucey@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. CR 16 – 0373 EJD |
|     Plaintiff, ) | |
| ) | UNITED STATES' OPPOSITION TO |
| v. ) | DEFENDANTS' OBJECTIONS TO MAGISTRATE ORDER |
| ) | |
| GOYKO KUBUROVICH, et al., ) | |
|     Defendants. ) | |

## I.   INTRODUCTION

The United States of America hereby submits this Memorandum in opposition to the defendants GOYKO KUBUROVICH ("G.K.") and KRISTEL KUBUROVICH ("K.K.")'s Objections to Magistrate Judge's Order Denying Discovery on Vindictive Prosecution. *See* December 22, 2017 Order, CR 52 (hereinafter "Order") (attached hereto as Exhibit 1). The Objections do not demonstrate that Magistrate Judge Nathanael M. Cousins' Order is "clearly erroneous" or contrary to law" as required under Rule 59(a) of the Federal Rules of Criminal Procedure and the Local Rules of this Court. The Objections should be overruled and the Motion otherwise denied.

## II.   PROCEDURAL AND FACTUAL BACKGROUND

### A.   Grand Jury Indictment

On August 25, 2016, a grand jury sitting in the Northern District of California returned a multi-count Indictment against the defendants. CR 1. The Indictment alleges that, prior to May 2010, G.K. had accumulated a total of approximately $2,133,053.00 in debt to various financial creditors. *See* Indictment, ¶2. Both defendants have been residents of the Northern District of California during the relevant period of the Indictment and jointly control Nata, LP, a limited California Partnership. *Id.*, at ¶¶1, 3.

**Scheme to Defraud**

The Indictment goes on to allege that the defendants devised a material scheme to defraud, and for purpose of executing and concealing the scheme, and attempting to do so, undertook to file a petition under Title 11 of the United States Code. *Id.* at ¶6. The purpose of the alleged scheme was for the defendants to enrich themselves through the filing of a Chapter 7 bankruptcy petition in United States Bankruptcy Court by G.K., containing materially false representations and omissions, causing the Court to discharge approximately $2,133,053.00 worth of FDIC insured debt that G.K. owed to his creditors. *Id.* at ¶7. The Indictment goes on to allege that, in furtherance of this scheme, G.K., with the knowing assistance of co-defendant, K.K., submitted a bankruptcy petition that, among other false statements and omissions, concealed approximately $868,000 in assets. *Id.*

**Overseas Transfers of Assets**

The Indictment further alleges that prior to, and in preparation for, the filing of the bankruptcy

petition, in December 2008, K.K. had opened United Security Bank Account #xxxx0823 and Pinnacle Bank Account xxxx0569 in her name and for which she was the sole signatory on both accounts. *Id.* at ¶8. Thereafter, the Indictment alleges, G.K. transferred a total of $750,000 into these two K.K.'s accounts, as follows:

- $250,000 was transferred into K.K.'s United Security Bank Account #xxxx0823 on December 18, 2008;
- $250,000 was transferred into K.K.'s United Security Bank Account #xxxx0823 on December 26, 2008;
- $250,000 was transferred into K.K.'s Pinnacle Bank Account #xxxx0569 on December 31, 2008.

*Id.* at ¶9-11.

A few days later, according to the Indictment, G.K. and K.K. opened an account at Verwaltungs Und Private-Bank AG in Liechtenstein, account number xxxxx104. *Id.* at ¶12.[1] Thereafter, K.K. undertook a series of transactions, as follows:

- K.K. transferred $500,000 from her USB account to Verwaltungs Und Private-Bank AG account number xxxxx.104, on January 25, 2009;
- K.K. transferred $399,975 from her Verwaltungs Und Private-Bank account xxxx.104 to her USB account xxxx0823 on April 6, 2009.

*Id.* at ¶¶12-13, and 15. Meanwhile, before she transferred the bulk of the $500,000 back to her USB account, K.K. opened another Pinnacle Bank account on February 20, 2009, in the name of Nata, LP, ending in #xxxx1277. *Id.* at ¶14.

According to the Indictment, one day after she has transferred nearly $400,000 back from Liechtenstein, K.K. obtained a cashier's check from that same her USB account in the amount of $597,000 and deposited it into the Nata, LP, account with Pinnacle Bank, account #xxxx1277. *Id.* at ¶17.

A little over a month later, on May 11, 2009, K.K. had authorized the wiring of $597,311.71 from that same Nata, LP account with Pinnacle Bank, account #xxxx1277, to Stewart Title to complete the purchase of 7170 Eagle Ridge Drive, Gilroy, California, real property which was subsequently used by G.K. and K.K. as a residence.

---

[1] Liechtenstein maintains a highly secret banking sector and has been identified by the Department of State as a "Jurisdiction of Primary Concern" along with, among other locales, the Cayman Islands, Jersey, and Switzerland. https://www.state.gov/j/inl/rls/nrcrpt/2012/vol2/184112.htm

**Fraudulent Filings in Bankruptcy Court**

Roughly a year after that real estate transaction was complete, on May 25, 2010, G.K. filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Northern District of California. *Id.* at ¶19. In the petition, G.K. is alleged to have knowingly failed to disclose the existence of the funds he had transferred into the new accounts of K.K., including the United Security Bank account #xxxx0823, and Pinnacle Bank account #xxxx0569 as well as the existence of other funds in bank accounts under his and K.K.'s control. *Id.* The Indictment goes on to allege that the petition knowingly failed to disclose G.K.'s ownership and control of his residence in Gilroy, California, which had been purchased with the subject funds from United Security Bank account #xxxx0823 and Pinnacle Bank account #xxxx1277. *Id.*

**The Charges Returned by the Grand Jury**

The underlying bankruptcy case in the Northern District of California was discharged on or about August 5, 2015. The statute of limitations for a charge arising out of a bankruptcy filing is set by the date of the discharge or the denial of same. 18 U.S.C. § 3284; *see, e.g., United States v. Dolan*, 120 F.3d 856, 867 (8th Cir. 1997) (concealment is a continuing offense where statute of limitations does not begin to run until five years after last act of concealment). In this case, the statute of limitations for the alleged criminal conduct in the underlying bankruptcy would be, at the earliest, on or about August 5, 2020. The Indictment was returned nearly four years *before* that date and alleges three counts under Title 18.

In Paragraphs 20-24, Count One charges G.K. and K.K. with Bankruptcy Fraud, in violation of 18 U.S.C. § 157 and § 2, and specifically alleges that the defendants undertook a scheme to defraud by filing a bankruptcy petition, and aiding and abetting in such filing, that concealed and otherwise omitted material assets in bankruptcy petition filed on May 25, 2010, specifically:

- Schedule A of the bankruptcy petition, G.K. failed to disclose real property over which he maintained control: the residence located at 7170 Eagle Ridge Drive, Gilroy, California, which G.K. and K.K. had purchased with a total cash payment of approximately $647,311.71 on May 11, 2009; and

- In Schedule B of the petition, G.K. failed to disclose personal property over which he maintained control: approximately $221,840.99 in cash which had been placed in bank accounts under the names of K.K. and Nata, L.P. at United Security Bank and Pinnacle Bank, as well as the existence of funds in other bank accounts under his and K.K.'S control;

Count Two, at Paragraphs 22-23, charges G.K. and K.K. with Concealment of Assets in a Bankruptcy Proceeding, in violation of 18 U.S.C. § 152(1) and § 2, and specifically alleges that the defendants did knowingly and fraudulently conceal from the United States Trustee, in connection with a case under Title 11 of the United States Code, property belonging to the estate of a debtor they were required to disclose in the bankruptcy petition, specifically:

- Schedule A of the bankruptcy petition, G.K. failed to disclose real property over which he maintained control: the residence located at 7170 Eagle Ridge Drive, Gilroy, California, which G.K. and K.K. had purchased with a total cash payment of approximately $647,311.71 on May 11, 2009; and

- In Schedule B of the petition, G.K. failed to disclose personal property over which he maintained control: approximately $221,840.99 in cash which had been placed in bank accounts under the names of K.K. and Nata, L.P. at United Security Bank and Pinnacle Bank, as well as the existence of funds in other bank accounts under his and K.K.'S control.

Finally, Count Three, at paragraphs 24-25, charges G.K. with making a materially false statement in a Bankruptcy Proceeding, in violation of 18 U.S.C. § 152(3), and specifically alleges that G.K. executed a materially false declaration, certificate, and verification under the penalty of perjury, as permitted under Section 1746 of Title 28, in and in relation to a case under Title 11, by submitting Schedules of Assets and Liabilities and a Statement of Financial Affairs, in his bankruptcy filing of May 25, 2010 as follows:

- Schedule A of the bankruptcy petition, G.K. failed to disclose real property over which he maintained control: the residence located at 7170 Eagle Ridge Drive, Gilroy, California, which G.K. and K.K. had purchased with a total cash payment of approximately $647,311.71 on May 11, 2009; and,

- In Schedule B of the petition, G.K. failed to disclose personal property over which he maintained control: approximately $221,840.99 in cash which had been placed in bank accounts under the names of K.K. and Nata, L.P. at United Security Bank and Pinnacle Bank, as well as the existence of funds in other bank accounts under his and K.K.'S control.

The Indictment also contains forfeiture allegations against both defendants. *Id.* at ¶26 *et seq.*

### B.  Procedural History

#### 1.  Motions for Discovery for Vindictive Prosecution Filed

The defendants were arraigned and pled not guilty to the charges in September 2016. *See* CR 7, 10. In December 2017, the defendants filed a series of motions for discovery regarding vindictive

prosecution. *See* CR 39, 41.  The Court, in the person of Magistrate Judge Nathanael Cousins, consolidated those motions and, after briefing from both parties, conducted oral argument on the motions on December 20, 2017.  CR 50.

### 2. Magistrate Judge Denies Both Discovery Motions

At the hearing, the Court heard lengthy argument from counsel for K.K. and the United States, after which the Court denied the motions for the reasons stated on the record.  CR 51-53; *see also* Exhibit 2 (Transcript of Proceedings before Magistrate Judge Cousins, December 20, 2017)("RT") attached hereto.   During the hearing, Magistrate Judge Cousins correctly confirmed the applicable law that "there's a presumption that when the Government does something, it's not doing it for vindictive reasons."  RT 4:5-6.  The Magistrate Judge also articulated the correct standard for discovery, that the defense has to make "a showing, a likelihood of this, and there has to be some evidence about it."  RT 4:7-8.  Magistrate Judge Cousins noted, however, that he would not "grant the motion based on speculation" including a belief that the Government had supposedly prepared a declination memo.  RT 6:11-17.

Magistrate Judge Cousins then confirmed the sum of the defense's proffer, namely that the timing of the Indictment after the defendants had been acquitted in a state court trial relating to marijuana cultivation, the cooperation between the state and federal authorities and sharing of information between them, and the weakness of the underlying federal Indictment collectively constituted "some evidence" of vindictiveness to shift the burden to the United States.  RT 5:10-9:24.

Magistrate Judge also received argument from the then assigned AUSA, Gary Fry, who had investigated and indicted the case, including:

- The Indictment had been returned nearly three months after the state court acquittal, "plenty of time for [supposed hot tempers] to cool down" (RT 10:13-14);
- The AUSA, who had decades of prosecution experience in state and federal court, "indicted this case when it was ready to be indicted" and, in fact, he was "working on it before the acquittal" (RT 10:16-17); and,
- The AUSA also observed that much of the defense's theory rested on a speculation that the federal authorities were "frustrated by our own inability to pursue the medical marijuana cases" and a guess that "evidence that we were 'outraged by the state's jury acquittal'" (RT11:18-21).

In response, the defense repeated their arguments regarding the timing of the federal charges and the cooperation between the state and federal authorities. However, while the defense contended that the case against at least K.K. was "weak," defense counsel also conceded that "I'm not going to say that we are going to win for sure" – in essence, an admission that the subject Indictment was, in fact, supported by probable cause to allege the crimes charged and backed up by sufficient evidence for a jury to convict both defendants at trial. RT 13:24.

Magistrate Judge Cousins then concluded the hearing. He first observed that the defendants' argument about the strengths and weaknesses of the evidence were arguments for trial. RT 14:15-22. He then found, applying the appropriate standard under Supreme Court and Ninth Circuit precedent, that he was not "persuaded by the defense evidence that there is prima facie showing of a likelihood of vindictiveness by some evidence intending to show the essential elements of the defense." RT 15:5-8. He further explained that, in his view, that test was not met, because there was in "no evidence" sufficient to meet the defendants' burden. RT15:9-14. Indeed, Magistrate Judge Cousins summarized his finding and holding, consistent with applicable authority that:

> [t]here has to be more than just a scent of vindictiveness, there has to be some evidence suggesting the likelihood of that. And I'm not persuaded that just the 11-week time period without something stronger, should lead me to permit this discovery.

RT 15:19-22.

The Court entered a written order on December 22, 2017, summarizing those findings and conclusions stated on the record in open court on December 20, 2017. *See* Exhibit 1.

### 3. Defendants File Objections to Magistrate Order

On January 4, 2018, the defendants filed the present Objections to Magistrate Order Denying Defense Motions for Discovery on Vindictive Prosecution, for consideration by the District Court. CR 55.

### 4. New Counsel for the United States

In the meantime, AUSA Gary G. Fry, the counsel of record since the inception of the matter, retired from federal service at the end of 2017, and new counsel substituted into the matter on January 4, 2018. CR 56. The District Court thereafter entered an order on January 5, 2018, directing the United States to file a response to those Objections on or before January 10, 2018. CR 57. Thereafter, as a

UNITED STATES' OPPOSITION TO OBJ. TO MAG. ORDER
CR 16 - 0373 EJD                                                7

courtesy to the new counsel for the United States, who had no prior participation in the matter, the United States' response was reset to January 26, 2018. CR 59, 64.

### 5. Summary of United States' Response to Objections

The United States submits that Magistrate Judge Cousins' Order correctly held that the defendants had failed to establish "a prima facie showing of a likelihood of vindictiveness by some evidence tending to show the essential elements of the defense." Exhibit 1 (quoting *United States v. One 1985 Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990)).

As the written order states, only in "limited circumstances" may "individuals have the right to pursue discovery to support a claim of vindictive prosecution." This is not one of them. As a matter of law, successive prosecution by dual sovereigns does not constitute grounds for vindictive prosecution. Communication between law officers of such sovereigns is also not a basis for discovery premised on vindictive prosecution. The defendants have not met, and indeed, cannot, meet the burden to demonstrate that the Order was "clearly erroneous or contrary to law" especially in light of their own stated concession that they cannot "say that we are going to win for sure" (RT 13:24) at any trial of this matter. Under such a proffer, discovery for vindictive prosecution is not appropriate. S*ee United States v. Lucas,* 841 F.3d 796, 804 (9th Cir. 2016) (affirming Magistrate Judge Laurel Beeler's denial of discovery (and District Court Judge Chen's overruling of defense objections) seeking information regarding alleged collusion between state and federal authorities in colluding against defendant in order to obtain successive prosecutions against the defendant). The Objections therefore should be overruled.

### III.  ARGUMENT

#### A.  Order Must Be Reviewed under "Clearly Erroneous" Standard and Local Rules

Magistrate Judge Cousins' Order denying the motion to compel should be affirmed because the Objections 1) fail to conform the Local Rules for Objections to a nondispositive order of a magistrate judge; and 2) do not establish that his decision was either "clearly erroneous or contrary to law." The defendants have filed a memorandum that exceeds the page limits of this Court by a full 21 pages. Even with such robust briefing, the defendants still fail to articulate the legal standard of review governing this Court's review of the Order.

Pursuant to Criminal Local Rule 2-1, the Criminal Local Rules have also adopted the Civil Local

Rules unless inconsistent with such rules. Civil Local Rule 72-2, in turn, provides that, for nondispositive matters, such as those related to discovery, any objections:

- Must specifically identify the portion of the Magistrate Judge's order to which objection is made and the reasons and authority therefor; [and]

- May not exceed 5 pages (not counting declarations and exhibits), and must set forth specifically the portions of the Magistrate Judge's findings, recommendation or report to which an objection is made, the action requested and the reasons supporting the motion and must be accompanied by a proposed order.

Civil Local Rule 72-2 goes on to explain that:

> Unless otherwise ordered by the assigned District Judge, no response need be filed and no hearing will be held concerning the motion. The District Judge may deny the motion by written order at any time, but may not grant it without first giving the opposing party an opportunity to respond. If no order denying the motion or setting a briefing schedule is made within 14 days of filing the motion, the motion shall be deemed denied. The Clerk shall notify parties when a motion has been deemed denied.

Of course, these relevant portions of the District's Local Rules simply provide the mechanism for the faithful application of Rule 59(a) of the Federal Rules of Criminal Procedure. When properly filed, "the district court must consider timely objections and modify or set aside any part of the order that is contrary to law or clearly erroneous." This standard of review is significantly deferential. Critically, the District Court "may not simply substitute its judgment for that of the deciding court." *Grimes v. City & Cnty. of San Francisco*, 951 F.2d 236, 241 (9th Cir. 1991). The order "is afforded broad discretion, which will be overruled only if abused." *Columbia Pictures, Inc. v. Bunnell*, 245 F.R.D. 443, 446 (C.D.Cal.2007). Here, the United States submits that the defense is re-arguing and expanding their original motion in an effort to have this District substitute its judgment for that of Magistrate Judge Cousins. That is not a basis to disturb Magistrate Judge Cousins' Order.

**B.     The Order was Neither "Clearly Erroneous" Nor "Contrary to Law"**

**1.     Motions for Vindictive Prosecutions Are Disfavored**

"In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Indeed, the doctrine of prosecutorial discretion places most pretrial prosecutorial decisions beyond challenge. *United States v. Soto-Beniquez*, 356 F.3d 1, 28 (1st Cir. 2004) (decisions

about whether and whom to prosecute do "not present an issue that is reviewable by [a] court"). A U.S. Attorney may elect to prosecute a criminal defendant on federal charges, rather than defer to state charges, even though the federal charges carry stiffer penalties. *United States v. Ballester*, 763 F.2d 368, 369-70 (9th Cir. 1985); *United States v. Turpin*, 920 F.2d 1377, 1388 (8th Cir. 1990); *United States v. Sammons*, 918 F.2d 592, 600-01 (6th Cir. 1990); *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989); *Hutcherson v. United States*, 345 F.2d 964, 967 (D.C. Cir. 1965). "[U]nder our system of separation of powers, the decision whether to prosecute, and the decision as to the charge to be filed, rests in the discretion of the Attorney General or his delegates, the United States Attorneys." *United States v. Edmonson*, 792 F.2d 1492, 1497 (9th Cir. 1986). "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." *Goodwin*, 457 U.S. 368, 382 (1982).

### 2. There Is No Basis for Vindictive Prosecution as a Matter of Law

Defendants' attempt to disturb the Order has no merit. In order to obtain discovery on vindictive prosecution, the defense has to establish "a prima facie showing of a likelihood of vindictiveness by some evidence tending to show the essential elements of the defense." *One 1985 Mercedes*, 917 F.2d at 421. To establish, in turn, a prima facie case of prosecutorial vindictiveness, a defendant must: (1) show direct evidence of vindictiveness; or (2) show circumstances establishing a "reasonable likelihood of vindictiveness" giving rise to a presumption that the United States must rebut. *United States v. Kent*, 649 F.3d at 912 (quoting *Goodwin*, 457 U.S. at 373).

The defendants cannot identify any direct evidence of vindictiveness. Indeed, the defendants concede that their only "evidence" is the "appearance of vindictiveness" arising out of the timing of the Indictment following the state acquittal on different charges. The Ninth Circuit has long ago concluded, however, that "vindictiveness will not be presumed simply from the fact that a more severe charge followed on, or even resulted from, the defendant's exercise of a right." *United States v. Gamez-Orduno*, 235 F.3d 453, 462 (9th Cir. 2000)).

The defense also fails to identify any pertinent circumstantial evidence establishing a reasonable likelihood of vindictiveness. The Ninth Circuit has held that a defendant establishes a reasonable likelihood of vindictiveness "when the 'totality of circumstances surrounding the prosecutorial decision

at issue' suggest the 'appearance of vindictiveness.'" *United States v. Robison*, 644 F.2d 1270, 1272 (9th Cir. 1981) (quoting *United States v. Griffin*, 617 F.2d 1342, 1347 (9th Cir. 1980)). In *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1169 (9th Cir. 1982), this Court held "[t]he appearance of vindictiveness results only where, as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because he has exercised his specific legal rights."

The United States submits that Magistrate Judge Cousins correctly ruled that the defendants had failed to meet their burden to show some evidence of a reasonable likelihood of vindictiveness. Simply put, where federal prosecution followed state prosecution arising out of the same facts, and the federal and state authorities collaborated during the state proceedings, the Ninth Circuit has held that such totality of circumstances does not give rise to a presumption of vindictiveness. *United States v. Lopez*, 474 F.3d 1208, 1211 (9th Cir. 2007), *overruled on other grounds* by *United States v. King*, 687 F.3d 1189 (9th Cir. 2012); *see also Robison*, 644 F.2d at 1272 (holding that where the federal prosecution immediately followed state prosecution and where there was no direct evidence of vindictiveness, the totality of circumstances did not give rise to a presumption of vindictiveness).

### a.   Successive Prosecutions by Different Sovereigns Not Vindictive

The defense's primary argument is the fact that the Indictment was returned three months after an acquittal on state charges, so as to be presumptively vindictive. However, it is black letter law that vindictive prosecution may not arise from successive state and federal prosecutions. *Robison*, 644 F.2d at 1273. The timing of a federal prosecution following a state prosecution arising out of the same conduct is not a circumstance indicating vindictive prosecution. *Lopez*, 474 F.3d at 1211. Here, as in *Lopez* and *Robison*, the timing of federal prosecution against the defendants that followed after the institution of state court charges for different conduct is insufficient to suggest a reasonable likelihood of vindictiveness. *Id.* at 1212.

Indeed, the Supreme Court has well established that successive prosecutions, even those based on the same conduct, are permissible if brought by separate sovereigns championing different interests. *See Heath v. Alabama*, 474 U.S. 82, 88 (1985) (Justice O'Connor, writing for the Court, upheld successive prosecutions based on similar underlying conduct when brought by separate sovereigns); *see*

*also Abbate v. United States*, 359 U.S. 187 (1959) (a defendant can be prosecuted by the United States notwithstanding a previous successful defense in state court without offending the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution); *United States v. Mikka*, 586 F.2d 152 (9th Cir. 1978), *cert. denied*, 440 U.S. 921 (1979).  State and federal sovereigns may independently and successively prosecute violations of each sovereign's applicable law because every citizen of the federal government is also a citizen of a state and both sovereigns have authority to punish individuals. *Id.*; *see also Lucas,* 841 F.3d at 804 (citing *United States v. Koon*, 34 F.3d 1416, 1439 (9th Cir. 1994) (finding "a defendant's 'conclusory allegations' of collusion were insufficient" to give rise to an appearance of vindictiveness)).

Moreover, federal charges following a favorable ruling for the defendant in state court is also not a circumstance indicating vindictive prosecution. *Robison*, 644 F.2d at 1273.  Indeed, if the courts were to hold that federal charges following a favorable state court ruling constituted a circumstance indicating vindictive prosecution, the courts would open the door for endless claims of vindictive prosecution.  For example, anytime a defendant achieves even the smallest state court victory (e.g., a successful motion for trial continuance), and is subsequently charged federally, the defendant may claim insulation from federal prosecution citing supposed federal animus (stemming from the successful delay of trial in state court) from exercise of due process rights in state court.

Taken to the logical extreme advocated by the defendants, such a rule would unreasonably require every separate sovereign federal prosecution to commence only after federal prosecutors reviewed all possible state and county court dockets and motions to divine from every defense motion and filing in all state court proceedings whether theoretically it may be construed that the United States was acting vindictively based on prior state court defense motions or filings.  Accordingly, following *Robison*, the mere fact that federal prosecution of the defendants followed a successful acquittal on different charges is insufficient to suggest a reasonable likelihood of vindictiveness. *Id.*

Furthermore, even if the possibility of a harsher federal sentence motivated the federal prosecution following a favorable state court sentencing enhancement ruling (and there is not allegation, let alone evidence of such motive), that motive has been found not to be evidence indicating vindictive prosecution. *United States v. Nance*, 962 F.2d 860, 865 (9th Cir. 1992) ("[T]here are no grounds for

finding a due process violation, even when the motive for federal prosecution is that harsher sentences are possible."); *United States v. Batchelder*, 442 U.S. 114, 125 (1979) ("The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause."). Following *Nance* and *Batchelder*, even if the possibility of a harsher sentence was the motive for federal prosecution of the defendants (and it was not here), such motive is not sufficient to suggest a reasonable likelihood of vindictiveness. *Nance*, 962 F.2d at 865; *Batchelder*, 422 U.S. at 125.

Defendants' reliance on *United States v. Jenkins*, 504 F.3d 694, 698-701 (9th Cir. 2007), is wholly misplaced. In *Jenkins*, a single sovereign (federal) case, the Ninth Circuit held that the defendant met his burden to show a reasonable likelihood of vindictiveness. In *Jenkins*, the federal prosecutor was found to have improperly brought additional federal charges against the defendant following a *federal* trial for unrelated *federal* criminal charges. *Id.* The defendants' pending federal prosecution before this Court, falls outside the scope of the holding in *Jenkins* because the successive prosecution by the federal authority followed a prosecution by a separate sovereign. *Lopez*, 474 F.3d at 1211-12; *Robison*, 644 F.2d at 1272.

Indeed, even assuming arguendo that someone in the U.S. Attorney's Office had deferred Indictment until after the outcome of the state charges (and there is no evidence, other than defense speculation and conjecture that such conduct occurred), the defense theory still would not prevail. In fact, the Second Circuit has held, on a similar motion, that it is well within the federal prosecutor's discretion to defer federal prosecution pending the outcome of a state case, and reinstitute the federal charges when the outcome of the state prosecution did not satisfy federal interests. *United States v. Ng*, 699 F.2d 63, 68 (2d Cir. 1983) (reversing district court's finding of the appearance of vindictiveness). Thus, even if the defendants' mere speculation was actually based in fact (and it is not), such circumstances would still fail to meet the burden to show some evidence of a reasonable likelihood of vindictiveness. *Id.*

### b. Communication between Sovereigns Not Vindictive

The defense reliance on the communication between state and federal law enforcement is also not evidence of the appearance of vindictiveness. To the contrary, such cooperation is favored and such

coordination, communication and collaboration are not circumstances indicating vindictive prosecution. *United States v. Figueroa-Soto*, 938 F.2d 1015, 1017-19 (9th Cir. 1991); *see also Lucas*, 841 F.3d at 804. Indeed, in *Figueroa-Soto*, this Court held that "there may be very close coordination in the prosecutions, in the employment of agents of one sovereign to help the other sovereign in its prosecution, and in the timing of the court proceedings so that the maximum assistance is mutually rendered by the sovereigns." 938 F.2d at 1019. In *Figueroa-Soto*, the United States Attorney's Office had been indirectly involved in the state prosecution, having discussed the case several times with the state prosecutor. Later, that same state prosecutor directly assisted in prosecuting the federal case as a specially designated federal prosecutor. *Id.* The Ninth Circuit found that not to constitute a basis for vindictive prosecution.

In this case, the fact that the federal grand jury returned charges on bankruptcy fraud after the defendant had been acquitted on other conduct is proper. Here, there were two different prosecutors who prosecuted each action. The fact that there may have been, as the defense would have the Court believe, close communication between state and federal law enforcement is also, in any event, wholly proper. There is no reason to permit discovery of vindictive prosecution premised on a theory that is contrary to the law of this Circuit. The fact that this communication occurred does not, as a matter of law, constitute evidence of even of the appearance of vindictiveness.

### c. The Defendants' Attack on the Evidence is Without Merit.

The defendants also renew their claim that the underlying evidence cannot sustain a conviction, so as to bootstrap the supposed evidence of vindictiveness. Magistrate Judge Cousins correctly dismissed that line of argument as a matter best left for the trial of the matter.

The defense does not content that the transactions that the form the basis of the allegations in the Indictment could not be proven at trial. Instead, the defense contends that the United States will not be able to prove the criminal intent of either defendant to commit the crimes charged. The element of intent is, of course, a common issue at trials. The defense also spends a great deal of argument in its objections discussing what it contends it can prove at trial, relative to intent, the alleged legality of the transfers, and the ultimate destination of such funds. Those arguments are merely that, argument, that will have to be resolved by the trier of fact based on the evidence. It does not mean the Indictment is

weak or otherwise improper.

The defense also contends that it believes it has a defense to the charges based on its interpretation of Title 11 and the various sections of the Bankruptcy Code. Such argument stands in tension with the defendants' own citation to *In re Hammerstein*, 189 F. 37 (2nd Cir. 1911). The defense claims that fraudulent concealment cannot occur where all legal interest has been transferred. That, of course, is a defense they can choose to present at trial. It does not mean that the Indictment, and the allegations contained in it, are weak or otherwise not provable beyond a reasonable doubt.

Furthermore, the defense does not address the impact of 18 U.S.C. § 2, aiding and abetting, on the defendants. The federal aiding and abetting statute, 18 U.S.C. § 2, states that a person who furthers—more specifically, who "aids, abets, counsels, commands, induces or procures"—the commission of a federal offense "is punishable as a principal." That provision derives from common-law standards for accomplice liability. *See, e.g., Standefer v. United States*, 447 U.S. 10, 14–19 (1980). Under section 2, "those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.*, 511 U.S. 164 (1994); *Hicks v. United States*, 150 U.S. 442, 449 (1893) (an accomplice is liable when his acts of assistance are done "with the intention of encouraging and abetting" the crime). Either defendant can be found liable for the crimes of the co-defendant, to extent the United States were to establish before a reasonable doubt the elements of section 2 at trial. The United States submits that the Indictment provides a basis for such liability, a fact that the defense itself conceded at the hearing that they were "not going to say that we are going to win for sure" at trial. RT 13:24.

### 3. The United States Continues to Reserve its Discovery Rights to the Requests

The defense has sought discovery from the United States under Rule 16 along with discovery from third parties under Rule 17. The United States renews and expands on its objections to the discovery based on the requests' failure to satisfy Rule 16, including the requirement of materiality.

#### a. Rule 16(a)(1)(E)(i) – Items Material to Preparing the Defense

Materiality generally requires "some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor."

*United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010). In determining materiality, the defense bears the burden of making a "threshold showing of materiality, which requires a presentation of facts which would tend to show that the government is in possession of information helpful to the defense." *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010). In this regard, "[n]either a general description of the information sought nor conclusory allegations of materiality suffice." *Caro*, 597 F.3d at 621 (quoting *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990)). Nor will plausible but conjectural assertions of materiality trigger any discovery obligations under this Rule. *United States v. Santiago*, 46 F.3d 885, 894-95 (9th Cir. 1995). "Rather, the defendant must make a specific request for the item together with an explanation of how it will be helpful to the defense." *United States v. Jordan*, 316 F.3d 1215, 1250 (11th Cir. 2003) (internal quotations omitted).

### b. The Discovery Must Be Related to the Government's Case-in-Chief

Critically, the Supreme Court has held that the Rule 16(a)(1)(E)'s obligation relates to discovery of items *material to a trial defense*. In the context of a motion for discovery to support a pre-trial selective prosecution claim, the Supreme Court held that "preparing the defendant's defense" in Rule 16 refers "*only to defenses in response to the Government's case in chief.*" *United States v. Armstrong*, 517 U.S. 456, 462 (1996) (emphasis added). In applying *Armstrong*, the courts have limited disclosure under Rule 16 to trial defense and, more particularly, to challenging the United States' case-in-chief. *See, e.g., United States v. Robinson*, 503 F.3d 522, 531-32 (6th Cir. 2007) (Rule 16(a)(1)(E)(i) has no application to sentencing proceedings); *United States v. Rashed*, 234 F.3d 1280, 1285 (D.C. Cir. 2000) (information not relating "to refutation of government's case in chief but to establishment of an independent constitutional bar to prosecution" not included).

### c. Structural Limitations on Disclosure

#### i. Rule 16(a)(2)

Rule 16(a)(2) of the Federal Rules of Criminal Procedure exempts two categories of materials from the broad disclosure requirements of Rule 16: "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case," Fed. R. Crim. P. 16(a)(2); and statements of government witnesses. *Id.*

The first exemption, for reports, memoranda, or other internal government documents "clearly recognizes the prosecution's need for protecting communications concerning legitimate trial tactics," *United States v. Koskerides*, 877 F.2d 1129, 1133-34 (2d Cir. 1989) (internal citations and quotation marks omitted), and it serves "to ensure that government attorneys' litigation preparations are protected from discovery." *United States v. Mann*, 61 F.3d 326, 331 (5th Cir. 1995).  In other words, this portion of Rule 16 performs a function similar to that performed by the common law work product doctrine; indeed, courts frequently commingle Rule 16(a)(2) and work product analyses when adjudicating discovery disputes. *See, e.g., Armstrong*, 517 U.S. at 463 (noting, "under Rule 16(a)(2), [a defendant] may not examine Government work product in connection with his case"); *United States v. Fernandez*, 231 F.3d 1240, 1247 (9th Cir. 2000); *United States v. Furrow*, 100 F.Supp.2d 1170, 1175 (C.D. Cal. 2000); *cf. United States v. Nobles*, 422 U.S. 225, 238 (1975) (describing as "vital" the role of the work product doctrine in "assuring the proper functioning of the criminal justice system"); *Hickman v. Taylor*, 329 U.S. 495, 510 (1947) (work product doctrine affords a qualified protection that entitles an attorney to withhold from discovery "written statements, private memoranda and personal recollections prepared or formed by . . . counsel" in anticipation of litigation ).

Some courts, however, have been careful to point out that the contours of Rule 16(a)(2) and the work product doctrine are not identical. *See United States v. Fort*, 472 F.3d 1106, 1115-16 (9th Cir. 2007) (stating, "Rule 16(a)(2)'s protection of investigative materials *extends beyond the work product privilege as defined in the civil context*") (emphasis added).  As but one example, whereas police reports are unlikely to be protected as work product in the course of civil litigation, *see, e.g., Miller v. Pancucci*, 141 F.R.D. 292, 303 (C.D. Cal. 1992), such reports may be covered – and therefore protected from disclosure – by Rule 16(a)(2) in the criminal context. *See, e.g., United States v. Sileven*, 985 F.2d 962, 966 (8th Cir. 1993) (*per curiam*).

To qualify for protection under the first exemption of Rule 16(a)(2), materials must have been created by a government attorney or a government agent to support a federal prosecution of the defendant, must be in the possession of the federal government, and must constitute an internal, non-public document. *Fort*, 472 F.3d at 1120 n.15; *cf. United States v. Green*, 144 F.R.D. 631, 641 (W.D.N.Y. 1992) (holding government documents discoverable "unless they have become the work

product of the federal investigators"). The phrase "government agent" need not designate a federal official and may include "non-federal personnel whose work contributes to a federal criminal 'case.'" *Fort*, 472 F.3d at 1113. In fact, the Ninth Circuit has held that investigatory reports prepared by state and local law enforcement may be covered by Rule 16(a)(2) if they are used by federal prosecutors in a case that is an outgrowth of investigations by those authorities, regardless of whether those reports were compiled before or after commencement of the federal role. *Fort*, 472 F.3d at 1119-20 (holding "Rule 16(a)(2) extends to . . . San Francisco police reports created prior to federal involvement but relinquished to federal prosecutors to support a unified prosecution"); *but see United States v. Cedano-Arellano,* 332 F.3d 568, 571 (9th Cir. 2003) (per curiam) (holding a drug-detection dog's certification documents and training records fell outside the scope of Rule 16(a)(2) and were therefore discoverable).

Rule 16(a)(2)'s first category has been read to protect a wide variety of reports, memoranda, and internal government documents prepared in connection with a particular prosecution. For example, one court has held that Rule 16(a)(2) makes it unnecessary for the government to disclose internal FBI logs of items seized from a defendant. *See United States v. Amlani*, 111 F.3d 705, 713 (9th Cir. 1997) (adding, "Rule 16(a)(2) clarifies that a defendant has an interest in the actual evidence in the government's control, not the government's records of that evidence").

The second sentence of Rule 16(a)(2) states: "Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500 [the Jencks Act]." Fed. R. Crim. P. 16(a)(2). Because the Jencks Act applies only to statements of testifying witnesses, the logical implication of this provision is that statements of non-testifying witnesses are not subject to disclosure under Rule 16. *See United States v. Edelin*, 128 F.Supp.2d 23, 35 (D.D.C. 2001); *cf. United States v. Nevels*, 490 F.3d 800, 803 (10th Cir. 2007) (noting the Jencks Act requires disclosure of witness statements "only after the witness has testified on direct examination at trial" (emphasis in original)). This Circuit's law similarly prohibits *compelled* pretrial disclosure of Jencks materials. *United States v. Hoffman*, 794 F.2d 1429, 1433 (9th Cir. 1986) (compelled pretrial disclosure of prospective witness statements violated the Jencks Act); *see also United States v. Jones*, 612 F.2d 453 (9th Cir. 1979) ("Appellant's reliance on the Jencks Act as a pre-trial discovery tool is completely misplaced."); *United States v. Trantino*, 846 F.2d 1384, 1414 (D.C. Cir. 1988)

("Congressional determination" prohibiting pre-trial orders of Jencks material "is not to be disregarded by the courts"); *In re United States*, 834 F.2d 283, 287 (2d Cir. 1987) (Jencks Act controls statements by witnesses and district court has "no inherent power to modify or amend the provisions of that Act").

### ii.  Common Law Privileges Apply to Limit Disclosure

Another commonly invoked form of executive privilege is the deliberative process privilege. *See In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). Under this privilege, the United States may be entitled to withhold from discovery "memoranda and discussions within the Executive Branch leading up to the formulation of an official position." *United States v. Zingsheim*, 384 F.3d 867, 872 (7th Cir. 2004). The deliberative process privilege is intended to preserve the quality of executive decisions by promoting frank and uninhibited discussion among those involved in reaching them. *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-51 (1975); *see also Dep't of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (citing "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news"); *cf. United States v. Nixon*, 418 U.S. 683, 705 (1974) (noting, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process").

The deliberative process privilege generally extends to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas Corp v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Material over which the privilege is claimed must be both "pre-decisional" and "deliberative." *Id.*; *see also Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988). The documents at issue may also be inter-agency or intra-agency in nature. *Klamath*, 532 U.S. at 9; *accord Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76-77 (2d Cir. 2002). Communications designed to assist the executive in advance of formulating an official position generally fall within the scope of the privilege, while those explaining official decisions afterward generally do not. *See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975); *see also Sears*, 421 U.S. at 151-52.

////

### iii. *Brady, Giglio,* and the Jencks Act

The defense also premises its authority for the subject discovery items on *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150, 154 (1972). The United States certainly does not dispute the ongoing application of *Brady* to a criminal case. As for *Giglio*, the United States does not dispute that *Giglio* may be relevant to certain discovery obligations, namely the production of information relating to the impeachment of any witness offered by the United States at trial or an evidentiary hearing in this matter. However, similar to the Jencks Act, the United States discovery obligations are triggered by testimony, not pre-trial discovery, since *Giglio* is directed toward the production of material that be relevant to the impeachment of a testifying witness.

## IV. CONCLUSION

For the reasons discussed herein, the United States submits that the Objections be overruled and the defendants' Motion denied.

DATED: January 26, 2018

Respectfully submitted,

ALEX G. TSE
Acting United States Attorney

_____/s/_____
TIMOTHY J. LUCEY
Assistant United States Attorney