ALEX G. TSE (CABN 152348)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

SCOTT SIMEON (NYBN 5012653)
JEFF SCHENK (CABN 234355)
Assistant United States Attorneys

   150 Almaden Boulevard, Suite 900
   San Jose, California 95113
   Telephone: (408) 535-5061
   FAX: (408) 535-5066
   scott.simeon@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. CR 16-00373 EJD |
|     Plaintiff, | ) |
| | ) UNITED STATES' RESPONSE TO |
|   v. | ) DEFENDANTS' MOTION FOR |
| | ) JUDGEMENT OF ACQUITTAL |
| GOYKO GUSTAV KUBUROVICH and | ) |
| KRISTEL KUBUROVICH, | ) Re: ECF 120 |
| | ) |
|     Defendants. | ) |

After the government closed its evidence, the defendants moved for a judgment of acquittal on all three counts. ECF 120. The Court should deny the defendants' motion in its entirety, as evidence exists to support each count.

**I.    LEGAL STANDARD**

In reviewing a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, the evidence presented at trial must be viewed in the light most favorable to the government. *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The Court must then determine whether this evidence, so viewed, is adequate to allow "*any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id*.

(emphasis in original) (alteration omitted) (quoting *Jackson*, 443 U.S. at 319).  This sufficiency-of-the-evidence review is a "limited inquiry" that asks whether "the government's case was so lacking that it should not have even been submitted to the jury." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016).  It "does not intrude on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Nosal*, 844 F.3d 1024, 1044 (9th Cir. 2016) (internal quotation marks omitted) (quoting *Musacchio*, 136 S. Ct. at 715), *cert. denied*, 138 S. Ct. 314 (2017).  "Reasonable" inferences are those that are "supported by a chain of logic, rather than mere speculation." *United States v. Navarrette-Aguilar*, 813 F.3d 785, 793 (9th Cir. 2015) (alteration omitted).  The government need not rebut all reasonable interpretations of the evidence that could establish innocence, nor must the government rule out every hypothesis except guilt. *Nevils*, 598 F.3d at 1164.  "[C]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992).

Where the defendant makes a motion under Rule 29 at the close of the government's case and the district court reserves ruling on the motion, the Court must decide the motion on the basis of the evidence at the time the ruling was reserved.  Fed. R. Crim. P. 29(b).

## II.  ARGUMENT

### A.  Elements of the Offense

The elements of count one, bankruptcy fraud, are:

> First, the defendant devised or intended to devise a scheme or plan to defraud;
>
> Second, the defendant acted with the intent to defraud;
>
> Third, the defendant's act was material; that is, it had a natural tendency to influence, or was capable of influencing the acts of an identifiable person, entity, or group; and
>
> Fourth, the defendant (a) filed a petition, (b) filed a document in a proceeding, or (c) made a false or fraudulent representation, claim or promise concerning or in relation to a proceeding under a Title 11 bankruptcy proceeding to carry out or attempt to carry out an essential part of the scheme.

ECF 127 at 17.

The elements of count two, concealment of assets, are:

> First, on or about the date alleged in the indictment, the proceeding in bankruptcy was in existence;
>
> Second, the defendant knowingly and fraudulently concealed the property described in the indictment from the custodian of the bankruptcy court or the bankruptcy trustee; and
>
> Third, the property concealed belonged to the estate of the debtor.

ECF 127 at 19.

The elements of count three, making a false statement, are:

> First, there was a bankruptcy proceeding;
>
> Second, the defendant made a declaration under penalty of perjury in relation to the bankruptcy proceeding;
>
> Third, the declaration related to some material matter;
>
> Fourth, the declaration was false; and
>
> Fifth, the defendant made the declaration knowingly and with the intent to deceive any creditor, the trustee, or the bankruptcy judge.

ECF 127 at 22.

The elements of aiding and abetting count two[1] are:

> First, someone else committed Concealment of Assets;
>
> Second, the defendant aided, counseled, commanded, induced or procured that person with respect to at least one element of Concealment of Assets;
>
> Third, the defendant acted with the intent to facilitate Concealment of Assets; and
>
> Fourth, the defendant acted before the crime was completed.

ECF 127 at 21.

**B.     Evidence Supporting Conviction of the Principal**

Evidence admitted during the government's case-in-chief showed the following facts that are not

---

[1] The government's aiding-and-abetting theory of liability in count one applies only to defendant Kristel Kuburovich. Because the jury acquitted Ms. Kuburovich of count one, ECF 129, the Rule 29 motion is moot with regard to her on that count only. *See, e.g., United States v. Ahrensfield*, No. CR-09-3457 JP, 2010 WL 11619114, at *1 n.1 (D.N.M. Aug. 24, 2010) (finding a Rule 29 motion moot as to a charge on which the jury found the defendant not guilty).

U.S. RESP. TO DEFS.' MOT. FOR JUDGEMENT OF ACQUITTAL
CR 16-00373 EJD                                              3

disputed in the defendants' motion: On May 25, 2010, bankruptcy proceeding no. 10-55471 came into existence with defendant/debtor Goyko Kuburovich's filing, under penalty of perjury, of a bankruptcy petition, schedules, and statement of financial affairs (Ex. 1); actions of bankruptcy courts and trustees, as well as a debtor's creditors, are capable of being influenced by information provided by the debtor in the petition about his or her assets and liabilities (Laffredi Test.; Greene Test.); at least $750,000 in assets that belonged to the estate of Mr. Kuburovich in December 2008 was transferred to Ms. Kuburovich (Exs. 58–59; Kikugawa Test.); by omitting those assets from his petition, Mr. Kuburovich declared that these assets were not his property (Exs. 1–4; Laffredi Test.); and a bankruptcy discharge was granted on August 5, 2015 (Laffredi Test.).

Evidence also demonstrated that Mr. Kuburovich, acting with the intent to defraud, devised a scheme to defraud that included: knowingly and fraudulently concealing his property from the bankruptcy court and trustee and from his creditors; and knowingly and intentionally making the false declaration that the property was not his. By the end of 2008, Mr. Kuburovich had stopped making his mortgage payments on his home at 18670 Castle Lake Drive in Morgan Hill, which was approximately $500,000 underwater (Ex. 41), and was making minimal payments on his almost $200,000 in credit card debt, and soon stopped paying that debt completely (Ex. 58). These debts were all listed on Schedule F attached to the bankruptcy petition. (Ex. 1). Around the same time, Mr. Kuburovich created two new business entities, NATA, LP, and a shell company called Destro, LLC, to serve as NATA's general partner. (Ex. 52). New bank accounts were opened in the name of NATA and Destro, with Kristel Kuburovich as the lone signatory, and in the name of Kristel Kuburovich, including a bank account in Liechtenstein. (Exs. 38, 58-7 to -9). Mr. Kuburovich made three transfers of $250,000 each from his personal bank accounts to Ms. Kuburovich's bank accounts in the United States, $500,000 of which was subsequently transferred to Liechtenstein. (Ex. 58). In March 2009, Mr. Kuburovich received a notice of foreclosure for his Morgan Hill home (Ex. 41), and just days later $50,000 was transferred from one of the U.S. bank accounts in Ms. Kuburovich's name for the purchase of a new home at 7170 Eagle Ridge Drive in Gilroy (Ex. 23). Four hundred thousand dollars was wired back from Liechtenstein to a U.S. bank account in Ms. Kuburovich's name, then combined with approximately $200,000 more dollars in that account and transferred to a NATA bank account. (Exs. 58–59). That money was then

used for an all-cash purchase of the 7170 Eagle Ridge property (Exs. 23, 58–59), which Mr. Kuburovich later used as collateral to secure a loan (Warda Test.). Although on paper it appeared that the transactions were completed under the name of Ms. Kuburovich, the evidence shows that the person actually using the business entities and assets was Mr. Kuburovich. (Exs. 8, 38, 49, 51; Warda Test.).

Given the timing of the three original transfers of $250,000 each—around the time that Mr. Kuburovich stopped making an effort to pay debts that he would later seek to have discharged through bankruptcy, while taking a European trip and a Gulf of Mexico cruise (Ex. 57)—it could reasonably be inferred that the transfers were part of a knowing, intentional plan to defraud. That plan included hiding assets from creditors and from the bankruptcy court and trustee, as well as making false statements regarding those assets on the bankruptcy petition. Moreover, at the time the petition was filed, there were additional funds in bank accounts under Mr. Kuburovich's name that were not disclosed on the petition at all. (Ex. 58-17). Mr. Kuburovich's omission of NATA and Destro from his Statement of Financial Affairs (Ex. 1), his omission of his own Liechtenstein bank account from Schedule B (Ex. 1), his later use of approximately $100,000 from Ms. Kuburovich's Liechtenstein account to pay one of his debts (ECF 118), and the tracing of all these assets back to Mr. Kuburovich's personal bank account (Exs. 58–59) are additional evidence of both an effort to conceal assets and Mr. Kuburovich's use of these assets.

### C. Evidence Supporting Conviction of the Aider and Abettor

The evidence above shows that Mr. Kuburovich committed, among other crimes, concealment of assets. Prior to the completion of the crime on August 5, 2015,[2] Ms. Kuburovich aided this concealment by receiving and hiding money—money that belonged to Mr. Kuburovich—in bank accounts in her name and in the name of NATA and Destro (Exs. 28, 38, 49, 58), while allowing Mr. Kuburovich to use this money for his own benefit (Exs. 8, 38, 46, 51; ECF 118). Ms. Kuburovich also aided the concealment of real property by purchasing the 7170 Eagle Ridge home in the name of NATA (Ex. 23), and by signing a loan and deed of trust (Ex. 43) when the loan was actually negotiated by Mr.

---

[2] "The concealment of assets of a debtor in a case under title 11 shall be deemed to be a continuing offense until the debtor shall have been finally discharged or a discharge denied." 18 U.S.C. § 3284.

Kuburovich for his own purposes (Warda Test.).

Evidence that Ms. Kuburovich acted with the intent to facilitate concealment of assets is circumstantial, but considerable, and the defendants' motion ignores some significant evidence that was admitted but not discussed in great detail by a witness. "It is settled law that intent to defraud may be established by circumstantial evidence." *United States v. Pelisamen*, 641 F.3d 399, 409 (9th Cir. 2011) (finding "sufficient circumstantial evidence" of an intent to defraud from (1) a series of checks bearing the defendants' signatures and (2) phone records showing that the two defendants often contacted each other on days the checks were written). Indeed, "circumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred, and is not to be distinguished from testimonial evidence insofar as the jury's fact-finding function is concerned." *United States v. Lopez*, 484 F.3d 1186, 1203 (9th Cir. 2007) (alterations omitted). Intent "may be inferred from misrepresentations made by the defendant[], and the scheme itself may be probative circumstantial evidence of an intent to defraud." *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008) (internal citations omitted); *see also United States v. Selby*, 557 F.3d 968, 978 (9th Cir. 2009) ("As . . . in other criminal fraud contexts, it is settled law that intent to defraud may be established by circumstantial evidence." (internal quotation marks and alterations omitted)); *United States v. Bucher*, 375 F.3d 929, 934 (9th Cir. 2004) ("Culpable intent can be inferred from the defendant's conduct and from the surrounding circumstances." (alterations omitted)).

Here, the question is whether there is sufficient circumstantial evidence of Ms. Kuburovich's intent to facilitate Mr. Kuburovich's "knowing[] and fraudulent[] conceal[ment] from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to [his] estate." 18 U.S.C. § 152(1). This evidence includes (1) the scheme itself, which continued for almost seven years; (2) the codefendants' close familial ties, including living under the same roof; (3) the frequent and significant financial transactions involving both codefendants' financial accounts, including accounts of businesses listed in the bankruptcy filing; (4) the suspicious timing of large transfers between and withdrawals from Ms. Kuburovich's banks accounts on the day of and in the days preceding the bankruptcy filing, and her closing of those accounts almost immediately after the

bankruptcy filing; and (5) the payment of one of Mr. Kuburovich's debts from Ms. Kuburovich's Liechtenstein bank account.

There was significant evidence at trial that there was a scheme to defraud, and that the essence of this scheme was to conceal assets from the bankruptcy court and the creditors listed in the bankruptcy filing. That evidence is summarized above. Two pieces of that evidence are worth highlighting here, as they show Ms. Kuburovich's consciousness of guilt. First, in January 2009, immediately after new U.S. bank accounts were opened in Ms. Kuburovich's name for the receipt of $750,000 from Mr. Kuburovich's personal bank accounts, the codefendants traveled to Liechtenstein to open additional bank accounts. (Exs. 47, 57–59). Neither Mrs. Patricia Kuburovich nor Natalie Kuburovich accompanied them on the trip (Ex. 47) because it was not a family vacation, but rather a business trip to open offshore accounts for the concealment of assets (Ex. 51). Ms. Kuburovich ostensibly detailed the trip in her blog, but conspicuously omitted any references to Liechtenstein or VP Bank. (Ex. 47). This omission is an indication that she knew the real purpose of the trip, and that she knew it was fraudulent. Second, in 2010 Ms. Kuburovich was questioned by law enforcement (ECF 118), and, during that questioning, she denied knowing about any foreign bank accounts in her name and denied knowing who owned the 7170 Eagle Ridge home (Ex. 5). But Ms. Kuburovich had the personal knowledge to answer both questions. By feigning ignorance, she again demonstrated her awareness that stating the truth would incriminate her.

There was also evidence at trial of the codefendants' father-daughter relationship, their living together, and their moving together. (Exs. 8, 47, 51). Although the defense focuses on a narrow period of time approximately 18 months before the bankruptcy filing, the scheme to conceal assets began at least as early as the formation of Destro on November 12, 2008 (Ex. 53), proceeded with the bankruptcy filing on May 25, 2010 (Ex. 1), and continued until the bankruptcy discharge on August 5, 2015 (Laffredi Test.)—just shy of *seven years*. Not only is it a reasonable inference that Ms. Kuburovich was aware of her father's creditors and his bankruptcy filing, it is almost inconceivable that she could remain unaware. In fact, it was not just her father's bankruptcy filing; it was a joint filing by both her mother and her father. Moreover, one of Mr. Kuburovich's creditors, Chase Home Finance, foreclosed on the family home at 18670 Castle Lake Drive. (Ex. 1 at 23, 37). It was only days after receiving the

foreclosure notice that $50,000 was wired from Ms. Kuburovich's account toward the purchase of 7170 Eagle Ridge Drive, where the family subsequently moved. (Exs. 8, 23, 41; ECF 118). According to Mr. Kuburovich, these financial troubles, including multiple civil lawsuits filed against him, began as early as February 2008. (Ex. 44 at 11). Six civil suits were either decided within the year prior to his bankruptcy filing, or were still pending at the time of his filing (Ex. 1 at 36–37), and every one of the plaintiffs in those suits is named as a creditor in the bankruptcy proceeding (Ex. 1 at 50–54). Again, it is almost impossible to believe that Ms. Kuburovich had no knowledge of any of this.

In addition to these close personal ties, there is also evidence of close financial ties, including financial transfers between Ms. Kuburovich's bank accounts and the accounts of business entities listed in the bankruptcy filing. Moreover, the transactions involving Ms. Kuburovich's account immediately before and after May 25, 2010, strongly suggest that the timing of these transactions is not mere coincidence. For example, Ms. Kuburovich's -0569 Pinnacle Bank account was opened on December 6, 2008 (Ex. 58-8), during the initial phase of the scheme to conceal assets from creditors and the bankruptcy court. Financial transactions between this account and business entities listed on Mr. Kuburovich's bankruptcy filing (Ex. 1 at 40–41) include: a December 11, 2009 transfer of $25,000 to MediLeaf; a January 4, 2010 transfer of $25,812 to MediLeaf; a January 21, 2010 transfer of $2,500 to Cornerstone Real Estate; a February 25, 2010 transfer of $1,000 to Bruce Ziegelman, a cosigner on one of the MediLeaf accounts (Ex. 33 at 7); a March 11, 2010 transfer of $15,000 to MediLeaf; and a March 16, 2010 transfer of $17,000 to MediLeaf. (Ex. 58-8).

Then, starting on April 6, 2010—precisely seven weeks before Mr. Kuburovich filed for bankruptcy—Ms. Kuburovich started making multiple large cash withdrawals and transfers to MediLeaf (Ex. 58-8). Those transactions included $84,100 in withdrawals and $40,000 in transfers to MediLeaf. Thirty-four thousand dollars of those transactions occurred either the day before or the day of the filing of the bankruptcy petition. Significantly, prior to the April 6, 2010 transaction, there had been zero such cash withdrawals from this account.

**Schedule 8**
**KRISTEL KUBUROVICH**
Pinnacle Bank, Account #102000569
12/06/2008 to 05/25/2010

| Account | Sequence | Bank Statement Date | Transaction Date | Description | Reference/Check # | Deposit Amount | Disbursement Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| Kristel E Kuburovich PB #102000569 | 29 | 05/05/2010 | 04/06/2010 | Cashier's Check | 512 | | -$25,000.00 | -$13,940.65 |
| Kristel E Kuburovich PB #102000569 | 30 | 05/05/2010 | 04/06/2010 | Kristel Kuburovich | 513 | | -$10,000.00 | -$23,940.65 |
| Kristel E Kuburovich PB #102000569 | 31 | 05/05/2010 | 04/06/2010 | Miscellaneous Credit Per Kristel Transfer From 1277 (Nata LP) | | $25,000.00 | | $1,059.35 |
| Kristel E Kuburovich PB #102000569 | 32 | 05/05/2010 | 04/08/2010 | Cash | | | -$5,000.00 | -$3,940.65 |
| Kristel E Kuburovich PB #102000569 | 33 | 05/05/2010 | 04/08/2010 | Miscellaneous Credit Per Kristel Transfer From 1277 (Nata LP) | 514 | $5,000.00 | | $1,059.35 |
| Kristel E Kuburovich PB #102000569 | 34 | 05/05/2010 | 04/12/2010 | CAPITAL ONE PHONE PYMT | | | -$900.00 | $159.35 |
| Kristel E Kuburovich PB #102000569 | 35 | 06/04/2010 | 05/07/2010 | Medileaf 1897 | 9999 | | -$25,000.00 | -$24,840.65 |
| Kristel E Kuburovich PB #102000569 | 36 | 06/04/2010 | 05/07/2010 | Cash | 9999 | | -$25,000.00 | -$49,840.65 |
| Kristel E Kuburovich PB #102000569 | 37 | 06/04/2010 | 05/07/2010 | Nata LP 1277 | | $75,000.00 | | $25,159.35 |
| Kristel E Kuburovich PB #102000569 | 38 | 06/04/2010 | 05/24/2010 | Cash | 9999 | | -$9,500.00 | $15,659.35 |
| Kristel E Kuburovich PB #102000569 | 39 | 06/04/2010 | 05/25/2010 | Cash | 9999 | | -$9,600.00 | $6,059.35 |
| Kristel E Kuburovich PB #102000569 | 40 | 06/04/2010 | 05/25/2010 | Miscellaneous Debit Transfer to 3513 (Medileaf), K Kuburovich | | | -$15,000.00 | -$8,940.65 |
| Kristel E Kuburovich PB #102000569 | 41 | 06/04/2010 | 05/25/2010 | Miscellaneous Credit Transfer from 1277 (Nata LP), K Kuburovich | | $14,000.00 | | $5,059.35 |

(Ex. 58-8 at 3).

The timing of these withdrawals (as well as the incoming wire transfers from Ms. Kuburovich's NATA account) strongly suggests an intent to coordinate these financial transactions with the bankruptcy filing. One logical conclusion is that the codefendants were concerned about the possibility of Mr. Kuburovich's money being traced directly to Ms. Kuburovich's accounts (it was), and they wanted to comingle that money with MediLeaf's assets or convert it to untraceable cash before such tracing could be completed (they did). The account was closed on June 14, 2010, just three weeks after the filing of the bankruptcy petition. (Ex. 33 at 2).

Another example is NATA's -1277 Pinnacle Bank account, which was opened by Ms. Kuburovich on February 12, 2009, still during the initial phase of the scheme to conceal assets from creditors and the bankruptcy court. (Ex. 52-10). This account also involved financial transactions with

business entities listed on Mr. Kuburovich's bankruptcy filing. (Ex. 1 at 40–41). For example, on April 22, 2010, there was an outgoing transfer of $10,000 to MediLeaf, and on April 27, 2010, there was a $5,000 transfer to MediLeaf—both within a five-week pre-bankruptcy timeframe. (Ex. 52-10). There were also regular $1,000 monthly deposits from Cornerstone: on February 20, 2009; March 5, 2009; April 6, 2009; May 5, 2009; June 5, 2009; July 6, 2009; August 5, 2009; September 8, 2009; October 5, 2009; November 5, 2009; December 7, 2009; January 5, 2010; February 5, 2010; March 5, 2010; April 5, 2010; and, finally, on May 5, 2010. (Ex. 58-10). Then Mr. Kuburovich filed for bankruptcy (Ex. 1), and, as above, the account was closed just three weeks later, on June 14, 2010. (Ex. 33 at 1). When the account was closed, Ms. Kuburovich was issued a cashier's check for the remaining balance of $60,152, which was deposited into a new Citibank bank account three days later, on June 17, 2010. (Ex. 58-10).

In the midst of this flurry of financial activity, on May 7, 2010—two weeks before Mr. Kuburovich filed for bankruptcy—$149,037.50 was wired to the NATA account from the David Warda loan. (Exs. 43, 58-10, 59). As Mr. Warda testified, that loan was made to Goyko Kuburovich based on his representation that the loan money would be used for MediLeaf, and Kristel Kuburovich showed up to sign the loan documents. Half of this loan, $75,000, was moved from the NATA account to Ms. Kuburovich's account the same day, then subsequently transferred to MediLeaf or converted to cash. Another $14,000 followed the exact same route on May 25, 2010, and the remainder turned into the cashier's check described above. (Exs. 58-10, 59). Again, a strong inference can be drawn from the timing of these transactions that there was an intent to acquire additional money in the name of Ms. Kuburovich, then comingle that money with MediLeaf's assets immediately prior to Mr. Kuburovich's bankruptcy filing. As defense counsel elicited from Ms. Kikugawa on cross-examination, because there are multiple signers on the MediLeaf accounts (Ex. 33), it is impossible to determine simply by looking at the account documents who controls which, or how much, assets.

Intent may also be inferred from a defendant's misrepresentations. *Sullivan*, 522 F.3d at 974. The misrepresentation in this case is the operating agreement of Destro, the general partner of NATA, which stated that its purpose was to "engage in the business of ownership, investment, and development of real property." (Ex. 55 at 4). The operating agreement was signed by Kristel Kuburovich. (Ex. 55 at 11). As the financial transactions in Exhibit 58-10 indicate, this clearly was not its real purpose. In fact,

U.S. RESP. TO DEFS.' MOT. FOR JUDGEMENT OF ACQUITTAL
CR 16-00373 EJD                                         10

the loan from Mr. Warda secured by NATA's only real property is in perfect opposition to this stated purpose. Which begs the question: What was NATA's real function? The timing of the financial transactions described above with the filing of Mr. Kuburovich's bankruptcy petition provide the most logical answer: to hide assets that belonged to the estate of the debtor.

Finally, there are a couple of other links between Ms. Kuburovich and Mr. Kuburovich's bankruptcy proceeding from which her knowledge of that proceeding and her intent to conceal assets can be reasonably inferred. First, Mr. Kuburovich listed Kristel Kuburovich in section 10, "Other Transfers," of his June 21, 2011 amendment to his statement of financial affairs, describing her as a creditor and describing the transfer as his "1/8th interest in a Las Vegas, NV condominium . . . in exchange for cancellation of debt owed to Kristel Kuburovich." (Ex. 3 at 4). The more entanglement between Ms. Kuburovich and Mr. Kuburovich's business affairs, the less plausible it becomes that she is ignorant of his businesses' financial situation and his resulting bankruptcy. After all, although it is an individual bankruptcy petition, Mr. Kuburovich declares that his debts are "primarily business debts." (Ex. 1 at 1).

Second, "[t]he $101,359.56 transferred from Ms. Kuburovich's VP Bank account in Liechtenstein to the United States in March 2013 was used to pay one of Mr. Kuburovich's debts." ECF 118 at 2. March 2013 was almost three years after Mr. Kuburovich filed for bankruptcy, and more than two years before his bankruptcy discharge. The only debts in evidence are those that are listed in his bankruptcy filing, and there is proof that Ms. Kuburovich used this VP Bank account to conceal assets that should have been included in that filing. If over $100,000 from this offshore bank account in her name was used to pay one of those bankruptcy debts, how is it possible that she was not even aware of the debtor's bankruptcy?

### III. CONCLUSION

"In determining the sufficiency of circumstantial evidence, the question is not whether the evidence excludes every hypothesis except that of guilt but rather whether the trier of fact could reasonably arrive at its conclusion." *Nevils*, 598 F.3d at 1165. And "[i]n applying this test, the evidence is to be viewed as a whole and not link by link." *Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 210 (9th Cir. 1957). The evidence here, spanning a period of years and encompassing numerous financial

transactions timed with the filing of the bankruptcy petition, establishes a sufficient basis for a finding of guilt. Therefore, the defendants' motion should be denied.

DATED: September 28, 2018

Respectfully submitted,

ALEX G. TSE
United States Attorney

*/s/ Scott Simeon*
SCOTT SIMEON
JEFF SCHENK
Assistant United States Attorneys